# PAULEY, SURVIVOR OF PAULEY *v.* BETHENERGY MINES, INC., ET AL.

No. 89–1714.   Argued February 20, 1991—Decided June 24, 1991*

---

*Together with No. 90–113, *Clinchfield Coal Co.* v. *Director, Office of Workers' Compensation Programs, United States Department of Labor, et al.*, and No. 90–114, *Consolidation Coal Co.* v. *Director, Office of Workers' Compensation Programs, United States Department of Labor, et al.*, on certiorari to the United States Court of Appeals for the Fourth Circuit.

*Mark E. Solomons* argued the cause for respondents in No. 89–1714 and petitioners in Nos. 90–113 and 90–114. With him on the briefs for petitioners in Nos. 90–113 and 90–114 were *Laura Metcoff Klaus, Allen R. Prunty,* and *John J. Bagnato. Messrs. Bagnato* and *Solomons, Ms. Klaus, Curtis H. Barnette,* and *Mr. Prunty* filed a brief for respondent BethEnergy Mines, Inc.

*Christopher J. Wright* argued the cause for the federal respondent in all cases. With him on the briefs were *Solicitor*

*General Starr, Deputy Solicitor General Shapiro, Allen H. Feldman,* and *Edward D. Sieger.*

*Julian N. Henriques, Jr.,* argued the cause for petitioner in No. 89–1714 and private respondents in Nos. 90–113 and 90–114. With him on the briefs for petitioner in 89–1714 were *Robert E. Lehrer, Timothy P. Creany,* and *Blair V. Pawlowski. Sherry Lee Wilson* filed a brief for respondent Taylor in No. 90–113. *Thomas R. Michael* filed a brief for respondent Dayton in No. 90–114.†

JUSTICE BLACKMUN delivered the opinion of the Court.

The black lung benefits program, created by Congress, was to be administered first by the Social Security Administration (SSA) under the auspices of the then-existent Department of Health, Education, and Welfare (HEW), and later by the Department of Labor (DOL). Congress authorized these Departments, during their respective tenures, to adopt interim regulations governing the adjudication of claims for black lung benefits, but constrained the Secretary of Labor by providing that the DOL regulations "shall not be more restrictive than" HEW's. This litigation calls upon us to determine whether the Secretary of Labor has complied with that constraint.

I

A

The black lung benefits program was enacted originally as Title IV of the Federal Coal Mine Health and Safety Act of 1969 (FCMHSA), 83 Stat. 792, 30 U. S. C. § 901 *et seq.,* to provide benefits for miners totally disabled due at least in

---

†*Robert H. Stropp, Jr.,* and *Michael Dinnerstein* filed a brief for the United Mine Workers of America as *amicus curiae* urging reversal in No. 89–1714.

Briefs of *amici curiae* urging reversal in Nos. 90–113 and 90–114 and affirmance in 89–1714 were filed for the National Coal Association by *William E. Hynan;* and for the National Council on Compensation Insurance by *Michael Camilleri.*

part to pneumoconiosis arising out of coal mine employment, and to the dependents and survivors of such miners.  See *Pittston Coal Group* v. *Sebben*, 488 U. S. 105, 108 (1988); *Mullins Coal Co.* v. *Director, Office of Workers' Compensation Programs, Dept. of Labor*, 484 U. S. 135, 138 (1987).

Through FCMHSA, Congress established a bifurcated system of compensating miners disabled by pneumoconiosis.[1] Part B thereof created a temporary program administered by the SSA under the auspices of the Secretary of HEW.  This program was intended for the processing of claims filed on or before December 31, 1972.  Benefits awarded under part B were paid by the Federal Government.  For claims filed after 1972, part C originally authorized a permanent program, administered by the Secretary of Labor, to be coordinated with federally approved state workers' compensation programs.  Benefits awarded under part C were to be paid by the claimants' coal mining employers.

Under FCMHSA, the Secretary of HEW was authorized to promulgate permanent regulations regarding the determination and adjudication of part B claims.  30 U. S. C. § 921(b).  The Secretary's discretion was limited, however, by three statutory presumptions defining eligibility under the part B program.  § 921(c).  For a claimant suffering from pneumoconiosis who could establish 10 years of coal mine employment, there "shall be a rebuttable presumption that his pneumoconiosis arose out of such employment." § 921(c)(1).  Similarly, for a miner with at least 10 years of

---

[1] Pneumoconiosis was identified by the Surgeon General as "a chronic chest disease caused by the accumulation of fine coal dust particles in the human lung." S. Rep. No. 95–209, p. 5 (1977).  What he described as simple pneumoconiosis seldom produces significant ventilation impairment, but it may reduce the ability of the lung to transfer oxygen to the blood. Complicated pneumoconiosis is a more serious disease, for the patient "incurs progressive massive fibrosis as a complex reaction to dust and other factors."  In its complicated stage, pneumoconiosis "usually produces marked pulmonary impairment and considerable respiratory disability." *Ibid.*

coal mine employment who "died from a respirable disease there shall be a rebuttable presumption that his death was due to pneumoconiosis." § 921(c)(2). Finally, there was an irrebuttable presumption that a miner presenting medical evidence demonstrating complicated pneumoconiosis was totally disabled as a result of that condition. § 921(c)(3). Consistent with these presumptions, HEW promulgated permanent regulations prescribing the methods and standards for establishing entitlement to black lung benefits under part B. See 20 CFR §§ 410.401 to 410.476 (1990).

## B

Dissatisfied with the increasing backlog of unadjudicated claims and the relatively high rate of claim denials resulting from the application of the HEW permanent regulations, Congress in 1972 amended FCMHSA and redesignated Title IV of that Act as the Black Lung Benefits Act of 1972 (Benefits Act). 86 Stat. 150. See S. Rep. No. 92–743 (1972). See also Comptroller General of the United States, General Accounting Office, Report to the Congress: Achievements, Administrative Problems, and Costs in Paying Black Lung Benefits to Coal Miners and Their Widows 16–18 (September 5, 1972) (nationally, as of December 31, 1971, claims filed were 347,716, claims processed were 322,582, and rate of claim denial was 50.5 percent). In addition to extending the coverage of part B to those claims filed by living miners prior to July 1, 1973, and those filed by survivors before January 1, 1974, the 1972 amendments liberalized in several ways the criteria and procedures applicable to part B claims. First, the amendments added a fourth statutory presumption of total disability due to pneumoconiosis for claimants unable to produce X-ray evidence of the disease. This presumption applied to a claimant with 15 years of coal mine employment who presented evidence of a totally disabling respiratory or pulmonary impairment. Congress expressly limited rebuttal of the presumption to a showing that the miner did not

have pneumoconiosis or that his respiratory or pulmonary impairment did not arise out of employment in a coal mine. 30 U. S. C. § 921(c)(4). Second, the 1972 amendments redefined "total disability" to permit an award of benefits on a showing that a miner was unable to perform his coal mining duties or other comparable work—as opposed to the prior requirement that the miner demonstrate that he was unable to perform any job, see § 902(f)—and prohibited HEW from denying a claim for benefits solely on the basis of a negative X ray. § 923(b). Third, the 1972 amendments made it easier for survivors of a deceased miner who had been disabled due to pneumoconiosis but had died from a cause unrelated to the disease to demonstrate eligibility for benefits. See § 901. Finally, the amendments made clear that "[i]n determining the validity of claims under [part B], all relevant evidence shall be considered." § 923(b).

In response to these amendments, the Secretary of HEW adopted interim regulations "designed to 'permit prompt and vigorous processing of the large backlog of claims' that had developed during the early phases of administering part B." *Sebben*, 488 U. S., at 109, quoting 20 CFR § 410.490(a) (1973).[2] These interim regulations established adjudicatory rules for processing part B claims that permit the invocation of a presumption of eligibility upon demonstration by the claimant of specified factors, and a subsequent opportunity for the SSA, in administering the program, to rebut the presumption.

Specifically, the HEW interim regulations permit claimants to invoke a rebuttable presumption that a miner is "to-

---

[2] Although the 1972 amendments did not direct the Secretary of HEW to promulgate these new interim regulations, the Report of the Senate Committee on Labor and Public Welfare contained a strongly worded invitation to do so. See S. Rep. No. 92–743, p. 18 (1972) ("Accordingly, the Committee expects the Secretary to adopt such interim evidentiary rules and disability evaluation criteria as will permit prompt and vigorous processing of the large backlog of claims consistent with the language and intent of these amendments").

tally disabled due to pneumoconiosis" in one of two ways. First, the claimant can introduce an X ray, a biopsy, or an autopsy indicating pneumoconiosis. 20 CFR § 410.490(b)(1)(i) (1990). Second, for a miner with at least 15 years of coal mine employment, a claimant may introduce ventilatory studies establishing the presence of a chronic respiratory or pulmonary disease. § 410.490(b)(1)(ii). In either case, in order to invoke the presumption, the claimant also must demonstrate that the "impairment established in accordance with paragraph (b)(1) of this section arose out of coal mine employment (see §§ 410.416 and 410.456)." § 410.490(b)(2).

Once a claimant invokes the presumption of eligibility under § 410.490(b), the HEW interim regulations permit rebuttal by the SSA upon a showing that the miner is doing his usual coal mine work or comparable and gainful work, or is capable of doing such work. See § 410.490(c).

The statutory changes adopted by the 1972 amendments and the application of HEW's interim regulations resulted in a surge of claims approvals under part B. See Lopatto, The Federal Black Lung Program: A 1983 Primer, 85 W. Va. L. Rev. 677, 686 (1983) (demonstrating that the overall approval rate for part B claims had substantially increased by December 31, 1974). Because the HEW interim regulations expired with the part B program, however, the Secretary of Labor was constrained to adjudicate all part C claims, *i. e.*, those filed after June 30, 1973, by living miners, and after December 31, 1973, by survivors, under the more stringent permanent HEW regulations. See *Sebben*, 488 U. S., at 110. Neither the Congress nor the Secretary of Labor was content with the application to part C claims of the unwieldy and restrictive permanent regulations. See Letter, dated Sept. 13, 1974, of William J. Kilberg, Solicitor of Labor, to John B. Rhinelander, General Counsel, Department of HEW, appearing in H. R. Rep. No. 94–770, p. 14 (1975). Not only did the application of the permanent regulations cause the DOL to process claims slowly, but the DOL's

claims approval rate was significantly below that of the SSA. See Lopatto, *supra*, at 691. Accordingly, Congress turned its attention once again to the black lung benefits program.

C

The Black Lung Benefits Reform Act of 1977 (BLBRA), 92 Stat. 95, approved and effective March 1, 1978, further liberalized the criteria for eligibility for black lung benefits in several ways. First, the Act expanded the definition of pneumoconiosis to include "sequelae" of the disease, including respiratory and pulmonary impairments arising out of coal mine employment. See 30 U. S. C. § 902(b). Second, BLBRA required the DOL to accept a board-certified or board-eligible radiologist's interpretation of submitted X rays if the films met minimal quality standards, thereby prohibiting the DOL from denying a claim based on a secondary assessment of the X rays provided by a Government-funded radiologist. See § 923(b). Finally, the BLBRA added a fifth presumption of eligibility and otherwise altered the entitlement structure to make it easier for survivors of a deceased long-term miner to obtain benefits. See §§ 921(c)(5) and 902(f).

In addition to liberalizing the statutory prerequisites to benefit entitlement, the BLBRA authorized the DOL to adopt its own interim regulations for processing part C claims filed before March 31, 1980. In so doing, Congress required that the "[c]riteria applied by the Secretary of Labor . . . shall not be more restrictive than the criteria applicable to a claim filed on June 30, 1973." § 902(f)(2).

The Secretary of Labor, pursuant to this authorization, adopted interim regulations governing the adjudication of part C claims. These regulations differ significantly from the HEW interim regulations. See 20 CFR § 727.203 (1990). The DOL regulations include two presumption provisions similar to the two presumption provisions in the HEW interim regulations. Compare §§ 727.203(a)(1) and (2) with §§ 410.490(b)(1)(i) and (ii). To invoke the presumption of eli-

gibility under these two provisions, however, a claimant need not prove that the "impairment . . . arose out of coal mine employment," as was required under the HEW interim regulations. See § 410.490(b)(2).

In addition, the DOL interim regulations add three methods of invoking the presumption of eligibility not included in the HEW interim regulations. Specifically, under the DOL regulations, a claimant can invoke the presumption of total disability due to pneumoconiosis by submitting blood gas studies that demonstrate the presence of an impairment in the transfer of oxygen from the lung alveoli to the blood; by submitting other medical evidence establishing the presence of a totally disabling respiratory or pulmonary impairment; or, in the case of a deceased miner for whom no medical evidence is available, by submitting a survivor's affidavit demonstrating such a disability. See §§ 727.203(a)(3), (4), and (5).

Finally, the DOL interim regulations provide four methods for rebutting the presumptions established under § 727.203. Two of the rebuttal provisions mimic those in the HEW regulations, permitting rebuttal upon a showing that the miner is performing, or is able to perform, his coal mining or comparable work. See §§ 727.203(b)(1) and (2). The other two rebuttal provisions are at issue in these cases. Under these provisions, a presumption of total disability due to pneumoconiosis can be rebutted if "[t]he evidence establishes that the total disability or death of the miner did not arise in whole or in part out of coal mine employment," or if "[t]he evidence establishes that the miner does not, or did not, have pneumoconiosis." See §§ 727.203(b)(3) and (4).

II

The three cases before us present the question whether the DOL's interim regulations are "more restrictive than" HEW's interim regulations by virtue of the third and fourth rebuttal provisions, and therefore are inconsistent with the agency's

statutory authority. In No. 89–1714, *Pauley* v. *BethEnergy Mines, Inc.*, the Court of Appeals for the Third Circuit concluded that the DOL interim regulations were not more restrictive. *BethEnergy Mines, Inc.* v. *Director, Office of Workers' Compensation Programs, Dept. of Labor*, 890 F. 2d 1295 (1989). John Pauley, the now-deceased husband of petitioner Harriet Pauley, filed a claim for black lung benefits on April 21, 1978, after he had worked 30 years in the underground mines of Pennsylvania. Pauley stopped working soon after he filed his claim for benefits. At a formal hearing on November 5, 1987, the Administrative Law Judge (ALJ) found that Pauley had begun to experience shortness of breath, coughing, and fatigue in 1974, and that those symptoms had gradually worsened, causing him to leave his job in the mines. The ALJ also found that Pauley had arthritis requiring several medications daily, had suffered a stroke in January 1987, and had smoked cigarettes for 34 years until he stopped in 1974.

Because respondent BethEnergy did not contest the presence of coal workers' pneumoconiosis, the ALJ found that the presumption had been invoked under § 727.203(a)(1). Turning to the rebuttal evidence, the ALJ concluded that Pauley was not engaged in his usual coal mine work or comparable and gainful work, and that Pauley was totally disabled from returning to coal mining or comparable employment. See §§ 727.203(b)(1) and (2). The ALJ then weighed the evidence submitted under § 727.203(b)(3), and determined that respondent BethEnergy had sustained its burden of establishing that pneumoconiosis was not a contributing factor in Pauley's total disability and, accordingly, that his disability did not "arise in whole or in part out of coal mine employment." § 727.203(b)(3). See *Carozza* v. *United States Steel Corp.*, 727 F. 2d 74 (CA3 1984).

Having determined that Pauley was not entitled to receive black lung benefits under the DOL interim regulations, the ALJ felt constrained by Third Circuit precedent to apply the

HEW interim regulations to Pauley's claim. He first concluded that respondent BethEnergy's concession that Pauley had pneumoconiosis arising out of coal mining employment was sufficient to invoke the presumption of total disability due to pneumoconiosis under § 410.490(b). Because the evidence demonstrated Pauley's inability to work, and the ALJ interpreted § 410.490(c) as precluding rebuttal of the presumption by "showing that the claimant's total disability is unrelated to his coal mine employment," the ALJ found that BethEnergy could not carry its burden on rebuttal, and that Pauley was entitled to benefits.

After the ALJ denied its motion for reconsideration, BethEnergy appealed unsuccessfully to the Benefits Review Board. It then sought review in the Court of Appeals for the Third Circuit. That court reversed. It pointed out that the decisions of the ALJ and the Benefits Review Board created "two disturbing circumstances." 890 F. 2d, at 1299. First, the court found it "surely extraordinary," *ibid.*, that a determination that Pauley was totally disabled from causes unrelated to pneumoconiosis, which was sufficient to rebut the presumption under § 727.203(b)(3), would *preclude* respondent BethEnergy from rebutting the presumption under § 410.490(c). Second, the court considered it to be "outcome determinative" that the purpose of the Benefits Act is to provide benefits to miners totally disabled at least in part due to pneumoconiosis if the disability arises out of coal mine employment, and that the ALJ had made unchallenged findings that Pauley's disability did not arise even in part out of such employment. 890 F. 2d, at 1299–1300. The court found it to be "perfectly evident that no set of regulations under [the Benefits Act] may provide that a claimant who is statutorily barred from recovery may nevertheless recover." *Id.*, at 1300.

Asserting that this Court's decision in *Pittston Coal Group* v. *Sebben*, 488 U. S. 105 (1988), was not controlling because that decision concerned only the invocation of the presump-

tion and not its rebuttal, the court then concluded that Congress' mandate that the criteria used by the Secretary of Labor be not more restrictive than the criteria applicable to a claim filed on June 30, 1973, applied only to the criteria for determining whether a claimant is "totally disabled," not to the criteria used in rebuttal. Finally, the court pointed out that its result would not differ if it applied the rebuttal provisions of § 410.490(c) to Pauley's claim, because subsections (c)(1) and (2) make reference to § 410.412(a), which refers to a miner's being "totally disabled due to pneumoconiosis." According to the Third Circuit, there would be no reason for the regulations to include such a reference "unless it was the intention of the Secretary to permit rebuttal by a showing that the claimant's disability did not arise at least in part from coal mine employment." 890 F. 2d, at 1302.

In the two other cases now before us, No. 90–113, *Clinchfield Coal Co.* v. *Director, Office of Workers' Compensation Programs, Dept. of Labor,* and No. 90–114, *Consolidation Coal Co.* v. *Director, Office of Workers' Compensation Programs, Dept. of Labor,* the Court of Appeals for the Fourth Circuit struck down the DOL interim regulations. John Taylor, a respondent in No. 90–113, applied for black lung benefits in 1976, after having worked for almost 12 years as a coal loader and roof bolter in underground coal mines. The ALJ found that Taylor properly had invoked the presumption of eligibility for benefits under § 727.203(a)(3), based on qualifying arterial blood gas studies demonstrating an impairment in the transfer of oxygen from his lungs to his blood. The ALJ then proceeded to weigh the rebuttal evidence, consisting of negative X-ray evidence, nonqualifying ventilatory study scores, and several medical reports respectively submitted by Taylor and by his employer, petitioner Clinchfield Coal Company. In light of this evidence, the ALJ concluded that Taylor neither suffered from pneumoconiosis nor was totally disabled. Rather, the evidence demonstrated that Taylor suffered from chronic bronchitis caused

by 30 years of cigarette smoking and obesity. The Benefits Review Board affirmed, concluding that the ALJ's decision was supported by substantial evidence.

The Court of Appeals reversed. *Taylor* v. *Clinchfield Coal Co.*, 895 F. 2d 178 (1990). The court first dismissed the argument that the DOL interim regulations cannot be considered more restrictive than HEW's as applied to Taylor because Taylor invoked the presumption of eligibility based on arterial blood gas studies, a method of invocation available under the DOL regulations but not under HEW's, and was therefore unable to use the rebuttal provisions of the HEW interim regulations as a benchmark. *Id.*, at 182. The court reasoned that it was a "matter of indifference" how the claimant invoked the presumption of eligibility and rejected the argument that the rebuttal provisions must be evaluated in light of corresponding invocation provisions. "It is the fact of establishment of the presumption and the substance thereof which is of consequence in this case, not the number of the regulation which provides for such establishment." *Ibid.*

Focusing on the DOL's rebuttal provisions in isolation, the Fourth Circuit determined that the third and fourth rebuttal methods "permit rebuttal of more elements of entitlement to benefits than do the interim HEW regulations," because the HEW regulations permit rebuttal "solely through attacks on the element of total disability," while the DOL regulations "allow the consideration of evidence disputing both the presence of pneumoconiosis and the connection between total disability and coal mine employment." *Ibid.* Accordingly, the court concluded that the DOL interim regulations were more restrictive than those found in § 410.490, and that the application of these regulations violated 30 U. S. C. § 902(f).[3]

---

[3] In light of this Court's decision in *Pittston Coal Group* v. *Sebben*, 488 U. S. 105 (1988), the Court of Appeals interpreted § 410.490(c) as permitting rebuttal of the presumption on a showing that the claimant's disability was not caused by coal mine employment. 895 F. 2d, at 183. The court

One judge dissented. Noting that the panel's decision was in conflict with the Sixth Circuit in *Youghiogheny & Ohio Coal Co.* v. *Milliken,* 866 F. 2d 195 (1989), and with the Third Circuit in *Pauley,* he concluded that those decisions "do less violence to congressional intent, and avoid . . . upsetting the statutory scheme." 895 F. 2d, at 184.

Albert Dayton, a respondent in No. 90–114, applied for black lung benefits in 1979, after having worked as a coal miner for 17 years. The ALJ found that Dayton had invoked the presumption of eligibility based on ventilatory test scores showing a chronic pulmonary condition. The ALJ then determined that petitioner Consolidation Coal Company had successfully rebutted the presumption under §§ 727.203(b)(2) and (4) by demonstrating that Dayton did not have pneumoconiosis and, in any event, that Dayton's pulmonary impairment was not totally disabling. The Benefits Review Board affirmed, concluding that the medical evidence demonstrated that Dayton's pulmonary condition was unrelated to coal dust exposure, but was instead secondary to his smoking and "other ailments," and that the ALJ had correctly concluded that Consolidation had rebutted the presumption under § 727.203(b)(4).[4]

The Fourth Circuit reversed. *Dayton* v. *Consolidation Coal Co.,* 895 F. 2d 173 (1990). Relying on its decision in *Taylor,* the court held that 30 U. S. C. § 902(f) required Dayton's claim to be adjudicated "under the less restrictive rebuttal standards of § 410.490." 895 F. 2d, at 175. Concluding that the HEW regulations did not permit rebuttal upon a

---

therefore remanded the case for further consideration of that issue. It appears that the Fourth Circuit has since retreated from this view and now considers the HEW interim regulations to permit only two rebuttal methods. See *Robinette* v. *Director, Office of Workers' Compensation Programs, Dept. of Labor,* 902 F. 2d 1566 (1990) (judgment order), cert. pending, No. 90–172.

[4] In light of this conclusion, the Board found it unnecessary to review the determination that Consolidation had successfully rebutted the presumption under subsection (b)(2) of the DOL interim regulations.

showing that the claimant does not have pneumoconiosis, the court stated that the ALJ's finding that Dayton does not have pneumoconiosis "is superfluous and has no bearing on the case." *Id.*, at 176, n.

In view of the conflict among the Courts of Appeals, we granted certiorari in the three cases and consolidated them for hearing in order to resolve the issue of statutory construction. 498 U. S. 937 (1990).[5]

## III

We turn to the statutory text that provides that "[c]riteria applied by the Secretary of Labor . . . shall not be more restrictive than the criteria applicable" under the interim HEW regulations. 30 U. S. C. § 902(f)(2). See *Sebben*, 488 U. S., at 113. Specifically, we must determine whether the third and fourth rebuttal provisions in the DOL regulations render the DOL regulations more restrictive than were the HEW regulations. These provisions permit rebuttal of the presumption of eligibility upon a showing that the miner's disability did not arise in whole or in part out of coal mine employment or that the miner does not have pneumoconiosis.[6]

---

[5] In addition to the Third Circuit, the Seventh Circuit has concluded that the third rebuttal provision of the DOL interim regulation is not more restrictive than the criteria applied by HEW. See *Patrick* v. *Old Ben Coal Co.*, 926 F. 2d 1482, 1488 (1991). The Seventh Circuit did not address the fourth rebuttal provision. The Sixth Circuit also has refused to invalidate the third and fourth rebuttal provisions of the DOL interim regulation, and continues to apply these provisions to all part C claims, regardless of whether the presumption is invoked under § 410.490 or § 727.203. See *Youghiogheny & Ohio Coal Co.* v. *Milliken*, 866 F. 2d 195, 202 (1989).

[6] In *Sebben*, the Court concluded that the DOL interim regulations were more restrictive than the HEW's to the extent that the DOL's invocation provision did not permit invocation of the presumption without 10 years of coal mining experience. See 488 U. S., at 113. The *Sebben* Court did not address the issue now before us: the validity of the third and fourth rebuttal provisions contained in the DOL interim regulations. See *id.*, at 119.

## A

In the BLBRA, Congress specifically constrained the Secretary of Labor's discretion through the directive that the criteria applied to part C claims could "not be more restrictive than" that applied to part B claims. 30 U. S. C. § 902(f)(2). The claimants and the dissent urge that this restriction is unambiguous, and that no deference is due the Secretary's determination that her interim regulations are not more restrictive than HEW's. In the alternative, both the claimants and the dissent argue that regardless of whether the statutory mandate is clear, the only interpretation of the HEW interim regulations that warrants deference is the interpretation given those regulations by the Secretary of HEW. In our view, this position misunderstands the principles underlying judicial deference to agency interpretations, as well as the scope of authority delegated to the Secretary of Labor in the BLBRA.

Judicial deference to an agency's interpretation of ambiguous provisions of the statutes it is authorized to implement reflects a sensitivity to the proper roles of the political and judicial branches. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 866 (1984) ("[F]ederal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do"); see also Silberman, *Chevron*—The Intersection of Law & Policy, 58 Geo. Wash. L. Rev. 821, 822–824 (1990). As *Chevron* itself illustrates, the resolution of ambiguity in a statutory text is often more a question of policy than of law. See Sunstein, Law and Administration After *Chevron*, 90 Colum. L. Rev. 2071, 2085–2088 (1990). When Congress, through express delegation or the introduction of an interpretive gap in the statutory structure, has delegated policymaking authority to an administrative agency, the extent of judicial review of the agency's policy determinations is limited. Cf. *Adams Fruit Co.* v. *Barrett*, 494 U. S. 638, 649 (1990) ("A precondition to deference under *Chevron* is a congressional

delegation of administrative authority"); *Chevron*, 467 U. S., at 864–866.

It is precisely this recognition that informs our determination that deference to the Secretary is appropriate here. The Benefits Act has produced a complex and highly technical regulatory program. The identification and classification of medical eligibility criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns. In those circumstances, courts appropriately defer to the agency entrusted by Congress to make such policy determinations. See *Martin* v. *Occupational Safety and Health Review Comm'n*, 499 U. S. 144, 152–153 (1991); *Aluminum Co. of America* v. *Central Lincoln Peoples' Utility Dist.*, 467 U. S. 380, 390 (1984).

In *Sebben*, we declined to defer to the Secretary's interpretation of the term "criteria" as used in § 902(f)(2), as including only medical but not evidentiary criteria, because we found Congress' intent to include all criteria in that provision to be manifest. See *Sebben*, 488 U. S., at 113–114, 116. With respect to the phrase "not . . . more restrictive than," Congress' intent is similarly clear: The phrase cannot be read except as a delegation of interpretive authority to the Secretary of Labor.

That Congress intended in the BLBRA to delegate to the Secretary of Labor broad policymaking discretion in the promulgation of her interim regulations is clear from the text of the statute and the history of this provision. Congress declined to require that the DOL adopt the HEW interim regulations verbatim. Rather, the delegation of authority requires only that the DOL's regulations be "not . . . more restrictive than" HEW's. Further, the delegation was made with the intention that the program evolve as technological expertise matured. The Senate Committee on Human Resources stated:

"It is the Committee's belief that the Secretary of Labor should have sufficient statutory authority . . . to

establish eligibility criteria . . . .   It is intended that pursuant to this authority the Secretary of Labor will make every effort to incorporate within his regulations . . . to the extent feasible the advances made by medical science in the diagnosis and treatment of pneumoconiosis . . . since the promulgation in 1972 of the Secretary of HEW's medical eligibility criteria."   S. Rep. No. 95–209, p. 13 (1977).

In addition, the Conference Report indicated that the DOL's task was more than simply ministerial when it informed the Secretary that "such [new] regulations shall not provide more restrictive criteria than [the HEW interim regulations], *except* that in determining claims under such criteria all relevant medical evidence shall be considered." H. R. Conf. Rep. No. 95–864, p. 16 (1978) (emphasis added). As delegated by Congress, then, the Secretary's authority to promulgate interim regulations "not . . . more restrictive than" the HEW interim regulations necessarily entails the authority to interpret HEW's regulations and the discretion to promulgate interim regulations based on a reasonable interpretation thereof.   From this congressional delegation derives the Secretary's entitlement to judicial deference.

The claimants also argue that even if the Secretary of Labor's interpretation of the HEW interim regulations is generally entitled to deference, such deference would not be appropriate in this instance because that interpretation has changed without explanation throughout the litigation of these cases.   We are not persuaded.   As a general matter, of course, the case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views.   See *Bowen* v. *Georgetown University Hospital*, 488 U. S. 204, 212–213 (1988).   However, the Secretary has held unswervingly to the view that the DOL interim regulations are consistent with the statutory mandate and not more restrictive than the HEW interim regulations.   This view obviously informed the structure of the

DOL's regulations. In response to comments suggesting that the DOL's proposed interim regulations might violate § 902(f)(2) because they required that all relevant evidence be considered in determining eligibility, the Secretary replied that "the Social Security regulations, while less explicit, similarly do not limit the evidence which can be considered in rebutting the interim presumption." See 43 Fed. Reg. 36826 (1978). Moreover, this position has been faithfully advanced by each Secretary since the regulations were promulgated. See, e. g., Sebben, 488 U. S., at 119. Accordingly, the Secretary's defense of her interim regulations warrants deference from this Court.

## B

Having determined that the Secretary's position is entitled to deference, we must decide whether this position is reasonable. See Chevron, 467 U. S., at 845. The claimants and the dissent argue that this issue can be resolved simply by comparing the two interim regulations. This argument is straightforward; it reasons that the mere existence of regulatory provisions permitting rebuttal of statutory elements not rebuttable under the HEW interim regulations renders the DOL interim regulations more restrictive than HEW's and, as a consequence, renders the Secretary's interpretation unreasonable. See Tr. of Oral Arg. 22–24. Specifically, the claimants and the dissent assert that the HEW interim regulations plainly contain no provision, either in the invocation subsection or in the rebuttal subsection, that directs factual inquiry into the issue of disability causation or the existence of pneumoconiosis. Accordingly, under the claimants' reading of the regulations, there is no manner in which the DOL interim regulations can be seen to be "not . . . more restrictive than" the HEW regulations.

The regulatory scheme, however, is not so straightforward as the claimants would make it out to be. We have noted before the Byzantine character of these regulations. See Sebben, 488 U. S., at 109 (the second presumption is "drafted

in a most confusing manner"); *id.*, at 129 (dissenting opinion) (assuming that the drafters "promulgated a scrivener's error"). In our view, the Secretary presents the more reasoned interpretation of this complex regulatory structure, an interpretation that has the additional benefit of providing coherence among the statute and the two interim regulations.

The premise underlying the Secretary's interpretation of the HEW interim regulations is that the regulations were adopted to ensure that miners who were disabled due to pneumoconiosis arising out of coal mine employment would receive benefits from the black lung program. Under the Secretary's view, it disserves congressional intent to interpret HEW's interim regulations to allow recovery by miners who do not have pneumoconiosis or whose total disability did not arise, at least in part, from their coal mine employment. We agree. See *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 22, n. 21 (1976) ("[A]n operator can be liable only for pneumoconiosis arising out of employment in a coal mine"); *Mullins Coal Co.* v. *Director, Office of Workers' Compensation Programs, Dept. of Labor*, 484 U. S., at 158 ("[I]f a miner is not actually suffering from the type of ailment with which Congress was concerned, there is no justification for presuming that the miner is entitled to benefits").

The Secretary and the nonfederal petitioners contend that SSA adjudications under the HEW interim regulations permitted the factual inquiry specified in the third and fourth rebuttal provisions of the DOL regulations. According to the Secretary, subsection (b)(2) of HEW's invocation provisions, and the provisions incorporated by reference into that subsection, do the work of DOL's third and fourth rebuttal methods. Subsection (b)(2) of the HEW interim regulations provides that in order to invoke a presumption of eligibility the claimant must demonstrate that the "impairment established in accordance with paragraph (b)(1) of this section arose out of coal mine employment (see §§ 410.416 and 410.456)." 20 CFR § 410.490(b)(2) (1990). Section 410.416(a) provides:

"If a miner was employed for 10 years or more in the Nation's coal mines, and is suffering or suffered from pneumoconiosis, it will be presumed, in the absence of persuasive evidence to the contrary, that the pneumoconiosis arose out of such employment."

See also § 410.456.

The Secretary interprets the requirement in § 410.490(b)(2) that the claimant demonstrate that the miner's impairment "arose out of coal mine employment" as comparable to the DOL's third rebuttal provision, which permits the mine operator to show that the miner's disability "did not arise in whole or in part out of coal mine employment." § 727.203(b)(3). With respect to the DOL's fourth rebuttal provision, the Secretary emphasizes that the statute defines pneumoconiosis as "a chronic dust disease . . . arising out of coal mine employment." See 30 U. S. C. § 902(b). Accordingly, she views the reference to §§ 410.416 and 410.456 in HEW's invocation provision, and the acknowledgment within these sections that causation is to be presumed "in the absence of persuasive evidence to the contrary," as demonstrating that a miner who is shown not to suffer from pneumoconiosis could not invoke HEW's presumption.[7]

Petitioners Clinchfield and Consolidation adopt the Third Circuit's reasoning in *Pauley*. The court in *Pauley* relied on the reference in the HEW rebuttal provisions to § 410.412(a)(1), which in turn refers to a miner's being "totally disabled due to pneumoconiosis." The Third Circuit reasoned that this reference must indicate "the intention of the Secretary

---

[7] The Court's conclusion in *Sebben* that subsection (b)(2) of HEW's interim regulations was not a rebuttal provision does not foreclose the Secretary's argument, as the *Sebben* Court made clear that that provision was, nonetheless, a "substantive requirement." See *Sebben*, 488 U. S., at 120. We agree with the *Patrich* court that "there is no meaningful difference between a procedure which creates a presumption and then allows evidence to rebut it and one which denies the presumption in the first place if the same evidence is offered." See *Patrich*, 926 F. 2d, at 1488.

[of HEW] to permit rebuttal by a showing that the claimant's disability did not arise at least in part from coal mine employment." 890 F. 2d, at 1302.

The claimants respond that the Secretary has not adopted the most natural reading of subsection (b)(2). Specifically, the claimants argue that miners who have 10 years of coal mine experience and satisfy the requirements of subsection (b)(1) automatically obtain the presumption of causation that § 410.416 or § 410.456 confers, and thereby satisfy the causation requirement inherent in the Act. In addition, the claimants point out that the reference in the HEW rebuttal provisions to § 410.412(a)(1) may best be read as a reference only to the definition of the term "comparable and gainful work," not to the disability causation provision of § 410.412(a). While it is possible that the claimants' parsing of these impenetrable regulations would be consistent with accepted canons of construction, it is axiomatic that the Secretary's interpretation need not be the best or most natural one by grammatical or other standards. *EEOC* v. *Commercial Office Products Co.*, 486 U. S. 107, 115 (1988). Rather, the Secretary's view need be only reasonable to warrant deference. *Ibid.; Mullins*, 484 U. S., at 159.

The claimants' assertion that the Secretary's interpretation is contrary to the plain language of the statute ultimately rests on their contention that subsections (b)(1)(i) and (ii) of the HEW interim regulations create a "conclusive" presumption of entitlement without regard to the existence of competent evidence demonstrating that the miner does not or did not have pneumoconiosis or that the miner's disability was not caused by coal mine employment. This argument is deficient in two respects. First, the claimants' premise is inconsistent with the text of the authorizing statute, which expressly provides that the presumptions in question will be rebuttable, see 30 U. S. C. §§ 921(c)(1), (2), and (4), and re-

quires the Secretary of HEW to consider all relevant evidence in adjudicating claims under part B.    See § 923(b).[8]

Second, the presumptions do not by their terms conclusively establish any statutory element of entitlement.    In setting forth the two rebuttal methods in subsection (c), the Secretary of HEW did not provide that they would be the exclusive methods of rebuttal.    In fact, the claimants admit that "conclusively presume" is a term they "coined" for purposes of argument.    Tr. of Oral Arg. 34.    Although the delineation of two methods of rebuttal may support an inference that the drafter intended to exclude rebuttal methods not so specified, such an inference provides no guidance where its application would render a regulation inconsistent with the purpose and language of the authorizing statute. See Sunstein, 90 Colum. L. Rev., at 2109, n. 182 (recognizing that the principle *expressio unius est exclusio alterius* "is a questionable one in light of the dubious reliability of inferring specific intent from silence"); cf. *Commercial Office Products Co.*, 486 U. S., at 120 (plurality opinion) (rejecting the more natural reading of statutory language because such an inter-

---

[8] That no element of the presumptions at issue was intended to be conclusive is further indicated by the language of the remaining two provisions in this section of the statute.    In § 921(c)(3), Congress demonstrated its ability to create an irrebuttable presumption, applicable to a miner for whom the medical evidence demonstrates the presence of complicated pneumoconiosis.    Perhaps more telling is § 921(c)(4), the only section of the statute in which Congress addressed the available methods of rebuttal. In that section, Congress created a rebuttable presumption of eligibility applicable to a miner with 15 years or more of coal mine employment, for whom evidence demonstrates the existence of a totally disabling respiratory disease but whose X rays do not reveal complicated pneumoconiosis. With respect to this presumption, Congress expressly provided: "The Secretary may rebut such presumption only by establishing that (A) such miner does not, or did not, have pneumoconiosis, or that (B) his respiratory or pulmonary impairment *did not arise out of*, or in connection with, employment in a coal mine."    Written as a limiting provision, this section indicates Congress' understanding that these rebuttal methods are among those permitted with respect to other presumption provisions.

pretation would lead to "absurd or futile results . . . plainly at variance with the policy of the legislation as a whole") (internal quotation marks omitted).

In asserting that the Secretary's interpretation is untenable, the claimants essentially argue that the Secretary is not justified in interpreting the HEW interim regulations in conformance with their authorizing statute. According to the claimants, the HEW officials charged with administering the black lung benefits program and with drafting the HEW interim regulations believed that it was virtually impossible to determine medically whether a miner's respiratory impairment was actually caused by pneumoconiosis or whether his total disability arose out of his coal mine employment. Faced with such medical uncertainty, and instructed to ensure the "prompt and vigorous processing of the large backlog of claims," see 20 CFR § 410.490(a) (1990), the claimants assert that HEW omitted from its criteria factual inquiries into disability causation and the existence of pneumoconiosis based on a "cost/benefit" conclusion that such inquiries would engender inordinate delay yet generate little probative evidence.[9] The dissent presents a similar view. *Post*, at 716–719.

---

[9] The claimants support this argument by reference to the HEW's Coal Miner's Benefits Manual (1979), which they claim represents the agency's contemporaneous interpretation of its regulation. Claimants assert that the manual "nowhere suggests" that the HEW interim regulations permit factual inquiry into the existence of pneumoconiosis or disability causation. The manual, however, does not demonstrate that HEW understood its interim regulations to preclude rebuttal with facts similar to DOL's third and fourth rebuttal provisions. At best, this document is ambiguous with respect to the statutory elements susceptible of rebuttal. See Manual, Part IV, § IB6(e) (stating that the presumption of entitlement to benefits "may be rebutted if . . . (3) Biopsy or autopsy findings clearly establish that no pneumoconiosis exists"). We find it more revealing that, in outlining the general structure of the interim regulations, the manual makes clear that "[t]o establish entitlement to benefits on the basis of a coal miner's total disability due to pneumoconiosis, a claimant must submit the evidence necessary to establish that he is a coal miner . . . who is . . . totally disabled

We recognize that the SSA, under the HEW interim regulations, appeared to award benefits to miners whose administrative files contained scant evidence of eligibility. See The Comptroller General of the United States, General Accounting Office, Report to Congress: Examination of Allegations Concerning Administration of the Black Lung Benefits Program 6–10 (1976), included in Hearings on H. R. 10760 and S. 3183 before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 94th Cong., 2d Sess., 440–444 (1976). We are not, however, persuaded that this circumstance requires the Secretary to award black lung benefits to claimants who do not have pneumoconiosis or whose disability did not arise in whole or in part out of coal mine employment. As an initial matter, contemporaneous analyses of claims approved by the HEW provide little support for the argument that the HEW made a "cost/benefit" decision to forgo inquiry into disease existence or disability causation. Rather, many of the claims allegedly awarded on the basis of insufficient evidence involved miners who were unable to present sufficient evidence of medical disability, not those who did not suffer from pneumoconiosis or were disabled by other causes. See *ibid.;* see also The Comptroller General of the United States, General Accounting Office, Program to Pay Black Lung Benefits to Miners and Their Survivors—Improvements Are Needed 45–47 (1977); H. R. Rep. No. 95–151, pp. 73–74 (1977) (Minority Views and Separate Views). Moreover, this argument ignores entirely the advances in medical technology that have occurred since the promulgation of the HEW interim regulations, advances that Congress could not have intended either HEW or the DOL to ignore in administering the program. See S. Rep. No. 95–209, p. 13 (1977).

Finally, we do not accept the implicit premise of this argument: that the Secretary cannot prevail unless she is able to

due to pneumoconiosis, and that his pneumoconiosis arose out of employment in the Nation's coal mines." *Id.,* Part IV, § IB1.

demonstrate that her interpretation of the HEW interim regulations comports with HEW's contemporaneous interpretation of those regulations. As is stated above, the Secretary's interpretation of HEW's interim regulations is entitled to deference so long as it is reasonable. An interpretation that harmonizes an agency's regulations with their authorizing statute is presumptively reasonable, and claimants have not persuaded us that the presumption is unfounded in this case.

## IV

We conclude that the Secretary of Labor has not acted unreasonably or inconsistently with 30 U. S. C. § 902(f)(2) in promulgating interim regulations that permit the presumption of entitlement to black lung benefits to be rebutted with evidence demonstrating that the miner does not, or did not, have pneumoconiosis or that the miner's disability does not, or did not, arise out of coal mine employment. Accordingly, we affirm the judgment of the Third Circuit in No. 89-1714. The judgments of the Fourth Circuit in No. 90-113 and No. 90-114 are reversed, and those cases are remanded for further proceedings consistent with this opinion. No costs are allowed in any of these cases.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this litigation.

JUSTICE SCALIA, dissenting.

I respectfully dissent. The disputed regulatory language is complex, but it is not ambiguous, and I do not think *Chevron* deference, see *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), requires us to accept the strained and implausible construction advanced by the Department of Labor (DOL). In my judgment at least one of the claimants before us is entitled to benefits under the statute.

I

A

As an initial matter, the Court misconstrues our *Chevron* jurisprudence. *Chevron* requires that we defer to an agency's interpretation of its organic statute once we determine that that statute is ambiguous. No one contends that the relevant *statutory* language ("shall not be more restrictive than") is ambiguous. See *Pittston Coal Group* v. *Sebben*, 488 U. S. 105, 113–114 (1988) (explaining that particular phrase). The only serious question surrounds the regulations of the then-extant Department of Health, Education, and Welfare (HEW) to which the statute refers. I agree that those regulations are complex, perhaps even "Byzantine," *ante*, at 699—but that alone is insufficient to invoke *Chevron* deference. Deference is appropriate where the relevant language, carefully considered, can yield more than one reasonable interpretation, not where discerning the only possible interpretation requires a taxing inquiry. *Chevron* is a recognition that the ambiguities in statutes are to be resolved by the agencies charged with implementing them, not a declaration that, when statutory construction becomes difficult, we will throw up our hands and let regulatory agencies do it for us. In my view the HEW regulations referred to by the present statute are susceptible of only one meaning, although they are so intricate that that meaning is not immediately accessible.

But even if the regulations were ambiguous, it would not follow that the Secretary of Labor is entitled to deference. Nothing in our *Chevron* jurisprudence requires us to defer to one agency's interpretation of another agency's ambiguous regulations. We rejected precisely that proposition in *Martin* v. *Occupational Safety and Health Review Comm'n*, 499 U. S. 144 (1991), in holding that the Occupational Safety and Health Review Commission (OSHRC) was not entitled to deference in interpreting the Secretary of Labor's regulations. Having used *Chevron* to rebuff OSHRC's incursions

there, it seems a bit greedy for the Secretary to use *Chevron* to launch the DOL's own cross-border attack here. In my view, the only legitimate claimant to deference with regard to the present regulations is the agency that drafted them.

### B

In any event, the interpretive issue here is, in my view, much less difficult than the Court suggests. Title 30 U. S. C. § 902(f)(2) states: "Criteria applied by the Secretary of Labor . . . [to black lung claims filed prior to April 1, 1980,] shall not be more restrictive [*i. e.*, shall not be less favorable to claimants] than the criteria applicable to a claim filed on June 30, 1973." The criteria applied by the Secretary of Labor are as follows:

"§ 727.203 Interim Presumption.

"(a) *Establishing interim presumption.* A miner who engaged in coal mine employment . . . will be presumed to be totally disabled due to pneumoconiosis . . . if one of the following medical requirements is met:

"(1) A chest roentgenogram (X-ray), biopsy, or autopsy establishes the existence of pneumoconiosis (see § 410.428 of this title);

"(2) Ventilatory studies establish the presence of a chronic respiratory or pulmonary disease . . .

"(3) Blood gas studies . . . demonstrate the presence of an impairment in the transfer of oxygen from the lung alveoli to the blood . . .

"(4) Other medical evidence . . . establishes the presence of a totally disabling respiratory or pulmonary impairment;

.        .        .        .        .

"(b) *Rebuttal of interim presumption.* In adjudicating a claim under this subpart, all relevant medical evidence shall be considered. The presumption in paragraph (a) of this section shall be rebutted if:

"(1) The evidence establishes that the individual is, in fact, doing his usual coal mine work or comparable and gainful work (see § 410.412(a)(1) of this title); or

"(2) In light of all relevant evidence it is established that the individual is able to do his usual coal mine work or comparable and gainful work (see § 410.412(a)(1) of this title); or

"(3) The evidence establishes that the total disability or death of the miner did not arise in whole or in part out of coal mine employment; or

"(4) The evidence establishes that the miner does not, or did not, have pneumoconiosis." 20 CFR § 727.203 (1990).

The criteria governing claims filed on June 30, 1973, were set forth in HEW interim regulations, 20 CFR § 410.490, which provide in relevant part:

"(b) *Interim presumption.* With respect to a miner who files a· claim for benefits before July 1, 1973, . . . such miner will be presumed to be totally disabled due to pneumoconiosis . . . if:

"(1) One of the following medical requirements is met:

"(i) A chest roentgenogram (X-ray), biopsy, or autopsy establishes the existence of pneumoconiosis (see § 410.428); or

"(ii) In the case of a miner employed for at least 15 years in underground or comparable coal mine employment, ventilatory studies establish the presence of a chronic respiratory or pulmonary disease . . .

"(2) The impairment established in accordance with paragraph (b)(1) of this section arose out of coal mine employment (see §§ 410.416 and 410.456).

.        .        .        .        .

"(c) *Rebuttal of Presumption.* The presumption in paragraph (b) of this section may be rebutted if:

"(1) There is evidence that the individual is, in fact, doing his usual coal mine work or comparable and gainful work (see § 410.412(a)(1)), or

"(2) Other evidence, including physical performance tests . . . establish that the individual is able to do his usual coal mine work or comparable and gainful work (see § 410.412(a)(1))."

The relationship between the two regulations is apparent because they use a similar structure and, in large part, similar language. Both allow claimants to invoke a presumption of disability due to pneumoconiosis upon the presentation of certain medical evidence (the HEW regulations provide for two types of medical evidence while the DOL regulations provide for four). Both specify certain ways in which that presumption may be rebutted. The HEW regulations, however, specify only two methods of rebuttal (both relating to the extent of the disability), while the DOL regulations authorize four methods (the two expressed in the HEW regulations plus two more: (1) that pneumoconiosis did not cause the disability, and (2) that the miner does not have pneumoconiosis).

Obviously, if the DOL regulations provide more opportunities for rebuttal, they are less favorable to claimants. I think it quite apparent that they do. The present case is illustrative. Claimant Pauley invoked the presumption by submitting X-ray evidence of pneumoconiosis, pursuant to § 727.203(a)(1). BethEnergy, the employer, rebutted the presumption by arguing pursuant to § 727.203(b)(3) that although Pauley had pneumoconiosis it did not cause his disability. Had the case proceeded under the HEW regulations, Pauley's presentation would have been the same, under § 410.490(b)(1)(i), the counterpart of § 727.203(a)(1).[1]

---

[1] The HEW regulations also contain a separate provision that would have required Pauley to show that his medical condition arose from working in a coal mine. § 410.490(b)(2). While that requirement is not set forth as a separate provision in the DOL regulations, it is presumably a

For BethEnergy, however, things would have been different: § 727.203(b)(3) does not have a counterpart in the HEW regulations. The only rebuttal expressly contemplated by the HEW regulations is that the claimant is not in fact disabled—but Pauley concededly was. It appears, therefore, that BethEnergy could not have challenged the causal link between the pneumoconiosis and the disability under the HEW regulations and thus would have had no defense.

In my view this argument is self-evidently correct and is obscured only by the technical complexity of the regulatory provisions. But the statutory *structure*, as opposed to the actual language, is simple. Under the HEW regulations, we assume "x," but "x" may be rebutted by a showing of "a" or "b." Under the DOL regulations, we likewise assume "x," but "x" may be rebutted by a showing of "a" or "b" *or* "c" *or* "d." It defies common sense to argue that, given this structure, the two regulations are in fact identical, and that Pauley, whose claim could be defeated by a showing of "c" but not by a showing of "a" or "b," was no worse off under the latter regime. Yet that is precisely the argument the Court accepts.

Pauley's commonsense reading is further supported by the fact that there is nothing remarkable about the HEW regulations' severely limiting rebuttal. The introduction to those regulations states:

> "In enacting the Black Lung Act of 1972, the Congress noted that adjudication of the large backlog of claims generated by the earlier law could not await the establishment of facilities and development of medical tests not presently available to evaluate disability due to pneumoconiosis, and that such claims must be handled under

---

part of § 727.203(b)(4), which requires that the miner have pneumoconiosis. Pneumoconiosis is specifically defined as a disease arising from work in a coal mine. 30 U. S. C. § 902(b). It is not contested that Pauley's pneumoconiosis arose from work in the mine—only that it, rather than his other ailments, was the cause of his disability.

present circumstances in the light of limited medical re-
sources and techniques. Accordingly, the Congress
stated its expectancy that the Secretary would adopt
such interim evidentiary rules and disability evaluation
criteria as would permit prompt and vigorous processing
of the large backlog of claims . . . ." § 410.490(a).

In this context, the limitation on rebuttal makes perfect
sense. Litigation over the existence of pneumoconiosis was
circumscribed: If the claimants introduced specified types of
medical evidence supporting their claim, that portion of the
case would be deemed established—thus avoiding the time-
consuming exchange of conflicting medical evidence which,
given the technology and scientific knowledge then available,
was likely to be inconclusive in any event. Similarly, litiga-
tion over the causal link between the disease and the disabil-
ity—which poses even more difficult medical questions—was
eliminated entirely by the presumption that if a miner had
pneumoconiosis and was disabled, he was disabled because of
pneumoconiosis. On the other hand, the regulations permit-
ted full litigation as to the existence of a disability, an area
where medical and scientific knowledge was equal to the task
and where agencies (and courts) typically think themselves
able to make reasoned assessments.[2]

In addition, apparently the interim regulations were at the
time thought to limit rebuttal. Literally thousands of cases
were decided pursuant to these regulations in the 1970's; nei-
ther the Government nor the employers have cited a single

---

[2] In its permanent regulations HEW did not use the § 410.490 interim
presumption. Significantly, the permanent regulations also outlined an
extensive procedure for contesting the link between a miner's pneumoconi-
osis and his disabilities. See § 410.426. The fact that this provision was
not contained in the interim procedures suggests that HEW thought dis-
ability causation would not be an issue there—and conforms to the view,
see § 410.490(a), that the interim presumptions would serve as a blunt
instrument for adjudication until full evidentiary procedures could be
developed.

instance in which the rebuttal allowed by the DOL regulations was permitted or indeed was even advanced, nor have they cited a single comment by the Secretary of HEW, any claimant, or any commentator suggesting that such rebuttal was available. I do not find that extraordinary. In my view that is the only reasonable reading of the regulations, and it is unsurprising that no one thought to read them otherwise. Indeed, that is precisely how we read them in *Pittston Coal*. Although the question was not specifically before the Court, in generally describing the two sets of regulations, we stated:

> "[T]he rebuttal provisions of the interim Labor regulation . . . permi[t] rebuttal *not only* on the grounds available in the interim HEW regulation (§ 410.490(c)), *but also* on the basis that 'the total disability or death of the miner did not arise in whole or in part out of coal mine employment' or that 'the miner does not, or did not, have pneumoconiosis.' See §§ 727.203(b)(1)–(4)." 488 U. S., at 111 (emphasis added).

## II

Although I think the HEW regulations clear (albeit complex) on their face, I turn now to the specific arguments why they should nevertheless not be read to limit rebuttal opportunities.

## A

First, the Government contends that the HEW rebuttal provisions actually include the two new rebuttal provisions apparently added by DOL. The principal claim here centers upon subsection (b)(2) of the HEW regulations. That provision states that the claimant must demonstrate that the "impairment established in accordance with paragraph (b)(1) of this section arose out of coal mine employment." 20 CFR § 410.490(b)(2) (1990). This requirement, the Government insists, is comparable to DOL's third rebuttal provision, which permits the employer to show that the miner's disabil-

ity did not arise from coal mine employment. That argument might be correct if "impairment" in subsection (b)(2) of the HEW regulations meant the same as "disability" in the DOL regulations. It does not. Subsection (b)(2) of the HEW regulations refers to the "impairment" established in subsection (b)(1); that subsection discusses proof of the existence of pneumoconiosis. The (b)(2) "impairment," then, is the disease itself. Thus, it is open to the employer under the HEW regulations to show, for example, that Pauley's *pneumoconiosis* did not arise from coal mine employment. But here everyone agrees that it did—the relevant question is whether Pauley's *disability* arose from his pneumoconiosis. That is where DOL diverges from HEW, for DOL's regulations allow proof that the *disability* did not arise from the disease and thus from coal mine employment; the HEW regulations require only a showing that the *impairment—i. e.,* the pneumoconiosis—arose from coal mine employment and presume the causal link between the impairment and the disability.

The Government contends that subsection (b)(2) of the HEW regulations also equates with the fourth rebuttal provision of the DOL regulations. The fourth rebuttal provision allows rebuttal on the ground that the claimant does not have pneumoconiosis. I think the Government's argument is partially correct—but only partially. As the Government notes, proof of pneumoconiosis involves proof of two elements: (1) a chronic dust disease, which (2) arose from coal mine employment. Subsection (b)(1) of the HEW regulations says the claimant must prove the first point, and says how to do it (by submitting the specified medical evidence and thereby raising the presumption). Subsection (b)(2) says that the claimant must also prove the second point (to which the presumption is irrelevant). To contest a finding of pneumoconiosis, the employer may wish to argue either (1) that the miner has a chronic dust disease but it did not arise from coal mine employment; or (2) that the miner does not have a chronic dust

disease. Subsection (b)(2) of the HEW regulations allows the employer to argue the former, but it says nothing about the latter; and subsection (b)(1) bars the latter argument, via the presumption, if the miner offers the specified medical evidence. DOL's fourth rebuttal allows the employer to argue either point—and thus, impermissibly, offers additional recourse to the employer.

The employers offer yet another contortion of the statute to the same effect. Section 410.490(c) states that rebuttal may be made through "evidence that the individual is, in fact, doing his usual coal mine work or comparable and gainful work (see § 410.412(a)(1))." The provision incorporated by reference reads as follows:

> "(a) A miner shall be considered totally disabled due to pneumoconiosis if:
>
> "(1) His pneumoconiosis prevents him from engaging in gainful work in the immediate area of his residence requiring the skills and abilities comparable to those of any work in a mine or mines in which he previously engaged with some regularity and over a substantial period of time . . . ."

Because this provision begins with references to the miner's disability due to pneumoconiosis, the employers believe it would be reasonable to construe it as authorizing the argument either that the miner does not have the disease or that the disease is not causing the disability. I do not find this a plausible explanation of the reference to § 410.412(a)(1). The logical reason for cross-referencing that provision was to include within the explicit rebuttal provision the more complete definition of "gainful work" that the incorporated section affords. Had HEW intended to create additional rebuttal provisions, it would simply have done so, explicitly and in parallel with the other rebuttal provisions, rather than backhandedly, through the incorporation by reference.

The Court apparently concedes that the companies' cross-reference argument is not the most natural reading of the

statute, but concludes that "the Secretary's view need be only reasonable to warrant deference." *Ante*, at 702. While I do not even think the foregoing argument reasonable (nor do I think the Secretary entitled to deference, see *supra*, at 707–708), I note that the Secretary herself does not advance it. Certainly private parties' speculation as to what the Secretary could have thought warrants no deference.

## B

The Government's second line of attack centers upon its claim that the HEW regulations, if read to limit rebuttal, would violate the Black Lung Benefits Act of 1972. That argument has potential force, for we are more willing to depart from the natural import of language when adhering to it would render a regulation unauthorized or a statute unconstitutional. It is important to note at the outset, however, that the Government has a heavy burden in this regard. Had the HEW regulations been challenged before this Court as inconsistent with the statute, we would have owed *Chevron* deference to the Secretary (of HEW). The Government's present argument depends on a showing, not that a natural reading of the HEW regulations produces less than the best reading of the statute, but that it produces an *unreasonable* one.

The Government argues, and the Court accepts, that "it disserves congressional intent to interpret HEW's interim regulations to allow recovery by miners who do not have pneumoconiosis or whose total disability did not arise, at least in part, from their coal mine employment," *ante*, at 700, and thus HEW must have permitted rebuttal on these grounds even if its regulations did not say so. I think that most unlikely. Any adjudication of claims necessarily involves a tradeoff between the speed and the accuracy of adjudication. As discussed above, the HEW presumptions were avowedly designed to enhance speed at the expense of accuracy, see § 410.490(a), pending the development of more

reliable procedures. As with all presumptions, their preclusion of full litigation of some issues left open the possibility that some claimants would receive benefits to which, in a perfect world, they would not be entitled. That is a necessary consequence of attempting to resolve complex and possibly indeterminate claims with a minimum of delay. I cannot say that in striking such a balance HEW violated a clear policy of Congress, for Congress itself had taken up the black lung issue in 1972 in part because of a perception that adjudication of claims was moving too slowly.

It is next argued that certain specific provisions of the authorizing statute mandate the methods of rebuttal later adopted by DOL. Specifically, according to the Court, "the authorizing statute . . . expressly provides that the presumptions in question will be rebuttable, see 30 U. S. C. §§ 921(c) (1), (2), and (4), and requires the Secretary of HEW to consider all relevant evidence in adjudicating claims . . . . See 30 U. S. C. § 923(b)." *Ante*, at 702–703. I see nothing in § 921, however, that contradicts HEW's limitation on rebuttal. Section 921(c)(1) provides: "If a miner who is suffering or suffered from pneumoconiosis was employed for ten years or more in one or more coal mines there shall be a rebuttable presumption that his pneumoconiosis arose out of such employment." That provision is simply irrelevant to the issue of whether rebuttal must be allowed as to either the existence of pneumoconiosis or the causal link between the disease and the disability. The HEW regulations do not purport to establish an irrebuttable presumption relating to the link between the disease and employment in coal mines.

Slightly more on point is § 921(c)(2), which provides: "If a deceased miner was employed for ten years or more in one or more coal mines and died from a respirable disease there shall be a rebuttable presumption that his death was due to pneumoconiosis." It is plausible to read that section as foreclosing HEW from establishing an *irrebuttable* presumption of causation based solely on death after 10 years' service.

But that is not what the HEW regulations do. Rather, they establish an irrebuttable presumption based upon 10 years' service plus substantial additional medical evidence. It is not inconsistent to say that certain evidence establishes a rebuttable presumption and additional, more persuasive evidence establishes an irrebuttable presumption.

Section 921(c)(4) is the most relevant, for it establishes a presumption of disability based upon a showing of pneumoconiosis. It then states in relevant part that "[t]he Secretary *may* rebut such presumption only by establishing that (A) such miner does not, or did not, have pneumoconiosis . . . ." (Emphasis added.) It is true that this rebuttal provision tracks the fourth rebuttal provision of the DOL regulations. However, § 921(c)(4) is *permissive*. It establishes the ways in which the Secretary *may* rebut a presumption but does not *require* that the Secretary use them. It is not inconsistent with the statute for the Secretary to decide that such rebuttal attempts would involve more administrative expense than they could justify and thus to adopt regulations declining to exercise the option.

In my view, the only colorable claim to a statutory conflict is based on § 923(b), which provides in part that "[i]n determining the validity of claims under this part, all relevant evidence shall be considered." The Government argues with some force that this precludes the use of presumptions that do not allow the introduction of all relevant evidence. That is an unanswerable argument with respect to evidence offered *by* the claimants. I think it reasonably maintainable, however, that the preclusion does not apply to evidence offered *against* them. At the time the interim regulations were adopted, HEW, not the employers, paid the benefits required under the Act. In adopting its presumptions, HEW was limiting the evidence it could offer to sustain its own position. The presumption provisions were, in effect, a waiver—which may well have been based upon compelling considerations of administrative efficiency. I think the stat-

ute is at least ambiguous as to whether the Secretary could elect not to contest claims based on certain evidence. Since we owe the Secretary (of HEW) *Chevron* deference in construing the statute, I cannot say that, if the Secretary had taken that position (as he apparently did in promulgating the regulations), we would not have accepted it as a permissible interpretation.

## C

The Government's final argument is that the HEW regulations do not expressly preclude rebuttal on grounds other than those specified. Thus, even if expanded rebuttal is not specifically provided for, neither is it foreclosed; the statute adopting the HEW regulations is simply ambiguous as to its availability, and we should defer to DOL's view that it should exist. It is true that the HEW regulations do not say that these are the *only* two ways to rebut the presumption. That is, however, the reasonable implication, as is suggested by the hoary canon of construction, *expressio unius est exclusio alterius*. When a provision sets forth a general rule followed by specific exceptions to that rule, one must assume—absent other evidence—that no further exceptions are intended. The Court argues that the principle of *expressio unius* is not absolute, and may be rejected where its application "would render a regulation inconsistent with the purpose and language of the authorizing statute." *Ante*, at 703. That is assuredly true; it is only one of many possible indications of meaning. Cf. *Burns* v. *United States*, *ante*, at 136–138 (invocation of *expressio unius* inappropriate where it would lead to absurd and arguably unconstitutional results). It is a strong indication, however, and the problem here is that there are no others. As discussed above, limitation of rebuttal is not contrary to the text or purpose of the authorizing statute, and neither the Government nor the Court offers any other reason for thinking that the listed exceptions are not exclusive.

## III

In sum, the DOL regulations impermissibly exceed the HEW regulations in at least two respects: (1) they allow employers to argue that a miner who has pneumoconiosis and is disabled is nevertheless not disabled due to the pneumoconiosis, and (2) where a miner has submitted specified evidence of a chronic dust disease, they allow the employer to challenge not only whether the disease is coal related, but whether the disease exists. That was the view of these regulations we expressed in *Pittston Coal*, see 488 U. S., at 111, and I see no reason to reconsider.[3] As to claimant Pauley, that divergence is conclusive, at least as far as the statute is concerned. (I do not address constitutional challenges to the statute, as these were not passed upon below.) The employer's only defense was that Pauley's pneumoconiosis was not the cause of his disability, and that defense was foreclosed under the HEW regulations. Thus, I would reverse in No. 89–1714. Claimant Dayton presents a more difficult case. He submitted ventilation studies showing a disease resembling pneumoconiosis. The employer wishes to argue that he does not have pneumoconiosis. As I read the regulations, the employer may not challenge the conclusion that Dayton has a pneumoconiosis-like disease, but may (depending upon the effect of other provisions not argued here) claim that the disease did not arise from coal mine employment. Since it is not clear on the present record which of these positions the employer is advocating, I would remand in No. 90–114. Finally, I agree with the Court that claimant Taylor is entitled to no relief. Taylor invoked the presumption of disability via a blood gas test, § 727.203(a)(3). That was not an approved method of invoking the presumption under the HEW regulations. Taylor cannot complain that DOL has treated him less well than HEW would have in allowing the

---

[3] Even if the Secretary of Labor were the proper party to claim *Chevron* deference in interpreting these regulations, I find her arguments to the contrary so implausible that I would not accept them in any event.

presumption to be rebutted, since under the HEW regulations he would not have been entitled to the presumption in the first place.  Accordingly, I would reverse in No. 90–113.

For the foregoing reasons, I respectfully dissent.