**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BADGER COAL COMPANY,
Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS'

COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR;
DOYLE KITTLE,
Respondents.

No. 95-1694

On Petition for Review of an Order
of the Benefits Review Board.
(90-2143-BLA)

Argued: March 6, 1996

Decided: April 30, 1996

Before HALL, HAMILTON, and LUTTIG, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** William Steele Mattingly, JACKSON & KELLY, Mor-
gantown, West Virginia, for Petitioner. Eileen Mary McCarthy,
UNITED STATES DEPARTMENT OF LABOR, Washington, D.C.,
for Respondents. **ON BRIEF:** Thomas S. Williamson, Jr., Solicitor
of Labor, Donald S. Shire, Associate Solicitor, Christian P. Barber,
Counsel for Appellate Litigation, UNITED STATES DEPARTMENT
OF LABOR, Washington, D.C., for Respondent Director.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Badger Coal Company petitions for review of an order of the Department of Labor's Benefits Review Board (BRB) upholding the award of black lung benefits to former miner Doyle Kittle. We affirm.

I.

Doyle Kittle was born on November 1, 1918. He worked in the coal mines for 35 years, all underground in dusty conditions. His last job was shuttle car operator for Badger Coal. In addition to coal dust, Kittle's lungs were subjected to approximately 40 years of cigarettes (one-half to one pack per day). Moreover, he has a rare genetic condition that causes a deficiency in a blood protein, alpha-1-antitrypsin. This protein protects the lungs, and persons with low levels of it are particularly susceptible to emphysema. For one or more of these reasons, Kittle has developed a totally disabling respiratory condition.

Kittle filed this claim seventeen years ago, in December 1978. It is therefore subject to the interim regulations at 20 C.F.R. Part 727. The claim has had a slow and tortuous history.

A claims examiner initially found Kittle eligible for benefits and so notified Badger Coal. Badger Coal pointed out that Kittle was still working. On October 31, 1979, approval of the claim was made contingent on Kittle's retirement, which occurred the following March. Badger Coal requested a hearing.

The hearing was held on June 5, 1980, and an administrative law judge (ALJ) issued a decision awarding benefits on September 16, 1980. Badger Coal requested review.

2

On July 23, 1982, a badly split BRB panel remanded the claim. On remand, the ALJ denied benefits, based largely on a then-new BRB decision[1] that rebuttal under 20 C.F.R. § 727.203(b)(3) could be established by proof that the miner's pneumoconiosis was not disabling "in and of itself."

Kittle filed a notice of appeal and a motion for reconsideration. The BRB dismissed the appeal as premature, and the motion was later denied. Kittle made a timely request for modification of the denial. A four-year lull then occurred, the cause of which is not apparent in the record. Meanwhile, we rejected the BRB's "in and of itself" standard for (b)(3) rebuttal in Bethlehem Mines Corp. v. Massey, 736 F.2d 120 (4th Cir. 1984).[2]

On October 27, 1988, the district director denied modification. Kittle requested a hearing, which was held October 19, 1989. Before the ALJ issued his decision, this court held that rebuttal under 20 C.F.R. § 727.203(b) was "more restrictive" than rebuttal under the regulations at 20 C.F.R. § 410.490, in violation of 30 U.S.C. § 902(f)(2), and that § 727.203(b) was consequently invalid in part. Taylor v. Clinchfield Coal Co., 895 F.2d 178 (4th Cir. 1990).

The ALJ awarded benefits on August 13, 1990. He made alternative holdings: first, under Taylor, the only form of rebuttal offered by the employer was unavailable; second, if Taylor were wrongly decided, he would nonetheless find that the employer had not established (b)(3) rebuttal. Badger Coal again appealed to the BRB, and, while the appeal was pending, the Supreme Court reversed Taylor. Pauley v. BethEnergy Mines, 501 U.S. 680 (1991).

On February 9, 1993, the BRB issued an odd sort of advisory opinion. It affirmed the ALJ's finding of no (b)(3) rebuttal, and contingently the award of benefits, but it remanded for reconsideration of whether modification was available at all. This remand never happened. The Director of the Office of Workers' Compensation Pro-

_____

**1 Jones v. The New River Company** , 3 BLR 1-199 (1981).
**2** Meeting similar disapproval from other circuits, the en banc BRB quickly overruled Jones. Borgeson v. Kaiser Steel Corp., 8 BLR 1-312 (1985).

3

grams requested reconsideration; meanwhile, this court adopted the Director's interpretation of the modification process. Jessee v. Director, OWCP, 5 F.3d 723 (4th Cir. 1993). In light of Jessee, the BRB granted the Director's motion and affirmed the award of benefits outright.

Badger Coal petitions for review.

II.

Within one year of the denial of a black lung claim, the claimant may request modification. 20 C.F.R. § 725.310(a). Modification is available if there has been a change in conditions or there were a mistake of fact in the prior denial. Id. Badger Coal asserts that modification was unavailable here. We disagree.

Until the year expires, the district director (or, if the claim is contested, the ALJ) has the authority to simply change his mind about a prior determination of fact, including the ultimate fact of entitlement. Jessee, 5 F.3d at 724-725; O'Keeffe v. Aerojet-General Shipyards, 404 U.S. 254, 256 (1971) (per curiam) (decided under Longshore and Harbor Workers Compensation Act). We will therefore review the decision on the merits.

III.

A.

The standard governing our review is familiar: the administrative decision must be affirmed if it is in accordance with the law and is supported by substantial evidence. Amigo Smokeless Coal Co. v. Director, OWCP, 642 F.2d 68 (4th Cir. 1981). The employer faces a difficult task here, and not only because of the deferential standard of review. The burden of proof on the pivotal issue-- (b)(3) rebuttal -- is on the employer, and it must make the strict showing required by Massey. Under Massey, the employer must rule out any contribution to or aggravation of the claimant's impairment by coal mine employment. The uncertain state of medical knowledge thus works to the miner's benefit. Id., 736 F.2d at 123-124. In sum, Badger Coal's only

4

prospect for success is to prove that all of Doyle's disabling impairment arises from a cause or causes other than coal mine employment.

B.

Badger Coal concedes that the interim presumption was properly invoked. All of the pulmonary function studies produced qualifying values, establishing the presumption under 20 C.F.R.§ 727.203(a)(2). In addition, every physician's opinion in the record diagnoses a totally disabling respiratory condition. Hence, the interim presumption could have been appropriately invoked under (a)(4) as well.[3]

C.

Though it relied on both § 727.203(b)(3) and (b)(4) rebuttal below, Badger Coal has abandoned the latter. On this record, (b)(3) rebuttal can be established, if at all, only with physicians' opinions.

Dr. Jerome Arnett examined Kittle in 1979. He diagnosed pneumoconiosis and with resulting total disability. Though he noted Kittle's smoking history, he did not explain his diagnosis in any detail.

Dr. Joseph Renn also examined Kittle in 1979. Relying on the report of a radiologist (whom he believed to be a B-reader, but who was not), Dr. Renn diagnosed simple pneumoconiosis. In addition, he found chronic obstructive pulmonary disease (COPD) resulting from chronic bronchitis and "marked" emphysema. Though he attributed all of Kittle's impairment to COPD, and opined that there was no connection between COPD and "pneumoconiosis," Dr. Renn did not state whether the COPD was contributed to or aggravated by Kittle's coal mine employment.

Dr. George Kress reviewed the record and rendered a report in 1980. He conceded the likely presence of pneumoconiosis, but, like Dr. Renn, attributed Kittle's impairment to COPD due to emphysema.

_____

[3] Kittle fell short of invoking the presumption in the other two available manners. The x-ray evidence neither proved nor disproved the presence of pneumoconiosis, and the clear majority of the blood gas studies were not qualifying.

5

He stated that cigarettes are the "primary" cause of obstructive emphysema, and he observed that "coal miners with many years of coal mine experience, with or without evidence of pneumoconiosis, may indeed develop a mild degree of respiratory impairment[,] but they do not develop advanced diffuse obstructive type of emphysema unless they are cigarette smokers." Kress thus concedes a possible contribution or aggravation from "coal mine experience," though not from clinical "pneumoconiosis."

Dr. Gary Craft examined Kittle in 1982. He diagnosed pneumoconiosis and moderate obstructive emphysema. He found Kittle totally disabled "secondary to" pneumoconiosis. His report fails to note Kittle's smoking history, so it is impossible to tell whether he was aware of it.

Dr. William Rom of the National Institute of Health examined Kittle in 1984. He stated:

> [I]t was felt that Mr. Kittle had extensive coal mine dust exposure and cigarette smoking experience that has resulted in severe obstructive lung disease. Because of his rare phenotypic abnormality resulting in a lower alpha-1-antitrypsin level than normal, it was felt that dust and dust gases and fumes from work or cigarette smoking could result in the severe obstructive lung disease observed.

Dr. Donald Rasmussen also examined Kittle in 1984. He noted Kittle's mine employment and cigarette smoking, and found Kittle to be totally disabled, but he did not state the etiology of the impairment.

Hospital records were also in evidence. Pneumoconiosis is regularly diagnosed on these records. For example, in a 1985 admission at Elkins Memorial, Drs. Schofield and Becerra diagnosed chronic bronchitis, COPD, cor pulmonale,**4** and pneumoconiosis.

_____

**4** Cor pulmonale is right-side congestive heart failure brought about by pulmonary dysfunction.

6

Dr. William San Pablo, Kittle's treating physician in the late 1980s, wrote a letter to "Whom It May Concern" in 1989. He stated that Kittle had severe obstructive lung disease and deserves benefits. Dr. San Pablo did not expressly attribute Kittle's disease to coal mine employment, however.

Dr. Renn examined Kittle again in 1989. In the 10-year lapse since his prior exam, Dr. Renn had become a B-reader himself, so he no longer relied on an x-ray reading by another. He read a new x-ray as 0/1, which is officially "negative" for clinical pneumoconiosis but which indicates the presence of some opacities, too few in number to constitute category 1 pneumoconiosis.[5] He was very impressed by the "reversibility" (that is, improvement) in Kittle's lung function after the administration of bronchodilators. To Dr. Renn, this improvement showed that Kittle's impairment has a significant obstructive component, unlike the restrictive impairment caused by clinical pneumoconiosis. Dr. Renn concluded:

> Mr. Doyle E. Kittle has chronic bronchitis-emphysema complex. He does not have pneumoconiosis. He has a very severe, significantly bronchoreversible, obstructive ventilatory defect of sufficient degree to prevent him from being able to perform his last known coal mining job of shuttlecar operator or any similar work effort. It is with a reasonable degree of medical certainty his obstructive ventilatory defect resulted from his years of tobacco smoking rather than exposure to coal dust.

Dr. Fino reviewed the medical record and issued two reports, both in 1989, which attributed Kittle's disability to smoking, with no contribution from coal mine employment.

The ALJ took this mixed bag of reports and held that the employer had failed to satisfy its burden of ruling out any connection between coal mine employment and some part of Kittle's disability. Though he conceded the impressive credentials of Drs. Renn, Fino, and Kress, the ALJ reasoned:

_____

**5 See** N. LeRoy Lapp, "A Lawyer's Medical Guide to Black Lung Litigation," 83 W. Va. Law Rev. 721, 729-730 (1981).

7

(1) Fino and Kress, unlike all the other physicians, failed to examine Kittle;

(2) Renn had "flip-flopped" on his diagnosis of pneumoconiosis, entitling his opinion to less weight;

(3) Renn's demonstration that Kittle's impairment was partially reversible with bronchodilators did not rule out contribution from a restrictive defect, because the pulmonary function results, even after bronchodilators, were still well within the qualifying range;

(4) the opinion of Dr. Craft, while entitled to "somewhat less weight" because it failed to note Kittle's smoking history, was nonetheless well-reasoned and well-documented;

(5) the opinions finding some contribution or aggravation from coal mine employment were more consistent with the long duration (35 years) and dusty conditions of that employment; and

(6) the progressively worsening pulmonary function tests and Kittle's credible complaints of worsening dyspnea suggested contribution or aggravation from pneumoconiosis.[6]

The ALJ's findings are not indisputable, but they are supported by substantial evidence.

Badger Coal relies most heavily on Dr. Renn's opinion. In his deposition, Dr. Renn did state flatly that coal dust exposure did not cause Kittle's impairment; however, he based this opinion on his prior explanation of why Kittle did not have "coal worker's pneumoconiosis." That prior explanation was insufficient to compel a finding of rebuttal as a matter of law, for these reasons: (i) Dr. Renn discussed "coal worker's pneumoconiosis" in only its clinical sense;[7] (ii) he then

_____

[6] The ALJ found that Kittle had quit smoking in the late 1970s or early 1980s.

[7] The disease clinicians call "coal workers' pneumoconiosis" is compensable under the Act, but so are many other chronic respiratory diseases caused or aggravated by exposure to coal dust. See 30 U.S.C.

8

posited that pneumoconiosis can cause only restrictive impairment; (iii) and, finally, because Kittle has a demonstrable obstructive impairment, Renn concluded that he must not have "pneumoconiosis." This court has recently rejected opinions that categorically exclude obstructive impairments from the legal definition of "pneumoconiosis":

> The evidence shows that [the doctor] based his opinion that [the miner] does not suffer from pneumoconiosis on the assumption that obstructive disorders cannot be caused by coal-mine employment. . . . We agree with [the miner] that these assumptions are erroneous. . . .

> Chronic obstructive lung disease thus is encompassed within the definition of pneumoconiosis for purposes of entitlement to Black Lung benefits.

Warth v. Southern Ohio Coal Co., 60 F.3d 173, 174 (4th Cir. 1995). Dr. Renn's opinion rests on the same assumption. Moreover, Dr. Renn did not explain how the pulmonary function tests demonstrated only an obstructive defect. Even after bronchodilators, Kittle's test results were well within qualifying range. It may be that this irreversible impairment is also purely obstructive, but Dr. Renn did not explain why he deems it so.

The award of benefits is affirmed.

AFFIRMED

_____

§ 902(b); 20 C.F.R. § 718.201. Unfortunately, the Act uses the clinicians' word "pneumoconiosis" to cover all of these compensable conditions, which has caused and continues to cause difficulty in evaluating the legal significance of a physician's use of the word. See Barber v. Director, OWCP, 43 F.3d 899, 901 (4th Cir. 1995); Robinson v. Pickands Mather & Co., 914 F.2d 35, 39 (4th Cir. 1990).

9