**BOARD OF TRUSTEES OF KNOX COUNTY HOSPITAL d/b/a Good Samaritan Hospital, Plaintiff,**

v.

**Donna E. SHALALA, as Secretary of the Department of Health and Human Services, Defendant.**

**No. TH 95–0162 C M/H.**

United States District Court, S.D. Indiana.

March 31, 1997.

---

William H. Thompson, William S. Hall, Hall, Render, Killian, Heath & Lyman, Indianapolis, IN, for Plaintiff.

Gerald A. Coraz, Asst. U.S. Atty., Office of U.S. Attorney, Indianapolis, IN, Donna Morros Weinstein, Lauren S. Ruby, U.S. Dept. of Health and Human Services, Chicago, IL, for Defendant.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

The term Rural Referral Center ("RRC") denotes a rural hospital with operating characteristics and costs similar to those of an urban hospital. Under the Medicare pro-

gram, RRCs receive reimbursement similar to urban hospitals. To qualify for RRC status, a hospital must meet four specific criteria established by regulation. The parties agree that Plaintiff Board of Trustees of Knox County Hospital, d/b/a/ Good Samaritan Hospital ("Good Samaritan" or "Hospital"), satisfied three of these criteria for its 1985 cost year. At issue here is whether the Hospital's case-mix index ("CMI") met the 1.03 threshold required by the applicable regulation for that year. The matter now pends on cross motions for summary judgment. Upon review of the present record, this Court concludes that Defendant Donna Shalala, Secretary of the Department of Health and Human Services ("Secretary"), did not act in a manner which was arbitrary and capricious, an abuse of discretion, or contrary to law when she determined that Good Samaritan's CMI did not satisfy the regulatory requirement. Accordingly, her action shall be upheld, her motion for summary judgment **GRANTED**, and the Hospital's motion for summary judgment **DENIED**.

## I. BACKGROUND

Good Samaritan is a 342–bed hospital located in Vincennes, Indiana. The Hospital offers many services comparable to urban hospitals, including end-stage renal dialysis services, inpatient and outpatient surgical services, and other resource-intensive, tertiary services. Because Good Samaritan offers such sophisticated services, it must compete with its urban counterparts for employees, medical specialists, and other support staff. As an additional result, the Hospital incurs costs similar to those of urban hospitals. Good Samaritan has been certified under the Medicare Program since 1966 and has qualified for RRC status for all years subsequent to 1985.

Initially, the Health Care Financing Administration of the United States Department of Health and Human Services ("HCFA" or "Agency") reimbursed Medicare providers based upon their reasonable costs. The providers sent the HCFA bills which detailed the services they furnished to Medicare inpatients. For twenty percent of the Medicare beneficiaries, hospitals also had to submit a narrative description of the beneficiary's diagnosis at discharge and the surgical procedures performed upon him or her. The HCFA coded these narratives and maintained both the billing information and the clinical information in a statistical file called MEDPAR.

In the early eighties, Congress determined that its method of reimbursing medical expenses at cost was inefficient. As a result, Congress enacted the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") to curb hospital spending by adjusting certain Medicare payment limits. At the same time, Congress directed the Secretary to develop a proposal for prospective Medicare reimbursement. The Secretary did so, and, on April 21, 1983, Congress voted to substitute the Prospective Payment System ("PPS") for cost-based reimbursement.

Under TEFRA, Congress instructed the Secretary to "establish case mix indexes for all short-term hospitals...." 42 U.S.C. § 1395ww(a)(1)(B)(i). The case mix index ("CMI") is a mathematical representation of the complexity—meaning cost—of the average case treated at a particular hospital. More particularly, the CMI represents the cost of a mix of cases at a specific hospital compared to the cost of the mix of cases at the average American hospital. To determine a CMI for each hospital provider, the Secretary relied upon the MEDPAR file devoted to that provider. Beginning in September of 1982, the Secretary calculated the 1981 CMI for each provider. In September of 1983, the Secretary published these CMIs in the Federal Register. In implementing the PPS, the Agency utilized these CMIs to compute Medicare reimbursement.

The CMI not only affects the amount of Medicare reimbursement a provider hospital may receive but also factors into the determination of whether the hospital may qualify as a RRC. Soon after the adoption of the PPS, Congress directed the Secretary to provide for sufficient "exceptions and adjustments" to providers' Medicare reimbursement "to account for the special needs of regional and national referral centers." 42 U.S.C.

§ 1395ww(d)(5)(C)(i). Of particular relevance to the instant case, Congress stated:

A hospital which is classified as a rural hospital may appeal to the Secretary to be classified as a rural referral center under this clause on the basis of criteria (established by the Secretary) which shall allow the hospital to demonstrate that it should be so reclassified by reason of certain of its operating characteristics being similar to those of a typical urban hospital located in the same census region. . . .

*Id.* Pursuant to this congressional directive, the Secretary prepared a regulation which stated the requirements a provider must satisfy to qualify for RRC status. This regulation was published in final form at 49 Federal Register 34,728 (August 31, 1984). To qualify, a provider must meet four separate requirements, only one of which has been contested in the present case. 42 C.F.R. § 405.476(g). Under Section 405.476(g)(1)(iii)(A), a hospital must have had a CMI of at least 1.03 for the year of 1981.[1]

The Code of Federal Regulations does not explicitly state what method or database the Secretary must use to determine a provider's 1981 CMI. However, the Secretary elected to rely upon the information contained in the MEDPAR database. When the Secretary published the final version of the regulation, it was noted that "we are revising § 405.476(g)(1)(iii)(A) to permit hospitals to meet the case-mix criterion by having a published case-mix index value that is equal to or greater than [ ] 1.03 in 1981 based on the index values published in the September 1, 1983 interim final rule. . . ." 49 Fed.Reg. at 34,741. In addition, the Secretary specifically rejected comments suggesting that "hospitals should be allowed to substitute other criteria for the one we published in the NPRM." *Id.,* at 34,743. According to the Secretary, the Agency "selected the 1981 case-mix index for this criterion because it represents the most current published data available." *Id.* Moreover, the Secretary indicated that the HCFA would not accept CMIs calculated by the providers or other entities, such as the Commission on Professional and Hospital Activities ("CPHA"):

The basic tenet of the prospective payment system is that the rates paid to hospitals are determined prospectively and are based on the best data available at the time. Thus, a hospital knows in advance what its payment amounts will be. In addition, revisions to case-mix index values, whether upward or downward, would upset the budget neutrality adjustment. Therefore, we have denied any hospital the right to request review of its 1981 case-mix index value based on 100 percent of its cases. This policy holds whether the request for review is for purposes of meeting the referral center criteria or for determining the hospital-specific portion of a hospital's payment rate.

We cannot allow substitution of the CPHA data in lieu of our published 1981 case-mix index because these data are developed and published by a source totally independent of HCFA. We have no way to verify either the raw data submitted by the hospital to CPHA or CPHA's processing of the data except by performing a 100 percent review ourselves. We do not believe a review by HCFA is appropriate.

*Id.* at 34,743–44.

On December 17, 1984, Good Samaritan submitted a written request to the HCFA asking to be designated as an RRC for the 1985 cost period. In this request, the Hospital acknowledged that the Agency had calculated and published its 1981 CMI as 1.0232. However, Good Samaritan also included a CMI study conducted by CPHA. Upon examination of one hundred percent of Good Samaritan's 1981 Medicare discharges—as opposed to the twenty percent included in the MEDPAR database-CPHA concluded that Good Samaritan's 1981 was 1.0637, which exceeded the minimum threshold and, when combined with the other undisputed criteria, qualified Good Samaritan for RRC status.

The Agency rejected Good Samaritan's request. Ultimately, the HCFA concluded that, although the Hospital did meet three of

1. The regulation also provided other methods by which a provider could qualify for RRC status; however, the only question in the present case is whether Good Samaritan satisfied the 1981 CMI requirement of 1.03.

the four necessary criteria, the Hospital's published CMI did not satisfy the minimum requirement. In particular, the HCFA stated that it could not accept recalculated CMIs, relying upon the policy stated in the Federal Register.

Good Samaritan appealed this ruling to the Provider Reimbursement Review Board ("PRRB" or "Board"). After a hearing in January, 1993, the PRRB determined that a Medicare provider has a statutory right to challenge the HCFA's determination of its CVI and to demonstrate that it should be designated an RRC. *See* 42 U.S.C. § 1395ww(d)(5)(C)(i). The Board also noted that the preamble language relied upon by the Agency lacks the force and effect of law. Accordingly, the Board ordered the HCFA to recalculate Good Samaritan's CMI using the data relied upon by CPHA.

The Agency then sought review by the HCFA administrator. On May 26, 1995, the administrator reversed the Board's decision, noting that the HCFA's policy did not allow the Hospital to substitute the CMI calculated by CPHA for the CMI calculated and published by the agency. On July 28, 1995, Good Samaritan appealed the administrator's decision to this Court.

## II. STANDARD OF REVIEW

Judicial review of the HCFA's decision is governed by 42 U.S.C. § 1395oo, which incorporates the standard of review of the APA. *Hinsdale Hosp. Corp. v. Shalala,* 50 F.3d 1395, 1399 (7th Cir.1995). Under the APA, a court must hold an agency's determination to be unlawful and set the action aside if the action is " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994) (*quoting* 5 U.S.C. § 706(2)(A)). This standard of review is deferential, presuming agency actions to be valid if supported by a rational basis. *Pozzie v. U.S. Dept. of Housing & Urban Development,* 48 F.3d 1026, 1029 (7th Cir.1995).

A court may not substitute its own judgment or " 'its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.' "

*Monsanto v. E.P.A.,* 19 F.3d 1201, 1206–07 (7th Cir.1994) (*Quoting Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)). Instead, courts should defer to an agency's interpretation of legislation if that reading is based on a permissible construction of the statute. *Estate of Whittle v. Commissioner of Internal Revenue,* 994 F.2d 379, 381 (7th Cir.1993). Similarly, the court must defer to the agency's interpretation of its regulations so long as the agency's interpretation is reasonable. *Kelley v. Board of Trustees, University of Illinois,* 35 F.3d 265, 271 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 938, 130 L.Ed.2d 883 (1995). Courts should give an agency's interpretation " 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " *Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. at 2386 (*quoting Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 150–51, 111 S.Ct. 1171, 1175–76, 113 L.Ed.2d 117 (1991)). As noted by the Supreme Court, "[t]his broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.' " *Id.* at 512, 114 S.Ct.at 2387 (discussing the Secretary's interpretations of regulations related to Medicare reimbursement) (*Quoting Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 697, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991)).

## IV. ANALYSIS

■ To demonstrate that the administrative decision in this case violated the applicable standard of review, Good Samaritan has advanced four separate arguments. First, the Hospital claims that the Medicare statute guarantees a provider the right to challenge the Secretary's determination and "to demonstrate" that it should be reclassified as an RRC. 42 U.S.C. § 1395ww(d)(5)(C)(i). According to the Hospital, this statutory right would be rendered meaningless unless a provider could present its own evidence. While this statute does authorize an appeal by a

hospital seeking designation as an RRC, it does not define what evidence the hospital may present. However, the statute does indicate that the hospital may be classified as an RRC "on the basis of criteria (established by the Secretary)...." *Id.* The Secretary has interpreted this language to mean that, although a hospital may present an appeal requesting classification as an RRC, the hospital must demonstrate that it meets the criteria established by the regulation in the manner defined by the preamble printed in the Federal Register.

The question before this Court is not whether the Secretary's interpretation is the best possible interpretation of the statute. The question is whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This Court believes the Secretary has reached a reasonable conclusion from the statutory language. Accordingly, the Hospital's argument that the Secretary's interpretation violates section 1395ww must fail.[2]

■ Second, Good Samaritan asserts that the Secretary's policy not to allow providers to submit their own independent studies to demonstrate that they meet the requirements for RRC certification is, in fact, a substantive rule rather than an interpretive rule. Because the Secretary did not promulgate this rule through the notice and comment procedures of the APA, the rule is invalid. This Court does not agree. Of course, the APA requires an agency to follow specific procedures when adopting certain types of rules. 5 U.S.C. § 553(b), (c); *Hoctor v. United States Dept. of Agriculture*, 82 F.3d 165, 167 (7th Cir.1996). "These procedural requirements do not apply, however, to 'interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice.'" *Hoctor*, 82 F.3d at 167 (quoting 5 U.S.C. § 553(a)(A)). As a general matter, "'[r]egulations,' 'substantive rules' or 'legislative rules' are those which create law, usually implementary to an existing law; whereas interpretive rules are statements as

to what the administrative officer thinks the statute or regulation means." *Alabama Tissue Center v. Sullivan*, 975 F.2d 373, 377 (7th Cir.1992); *State of Indiana v. Sullivan*, 934 F.2d 853, 856 (7th Cir.1991).

While distinguishing between a substantive rule and an interpretive rule "is often very difficult," *Hoctor*, 82 F.3d at 167, the distinction does not appear difficult in this matter. When the HCFA promulgated the regulations, as required by the APA, it received numerous comments. Some of those comments related to the types of proof a provider may submit to demonstrate that it satisfies the minimum CMI requirement. In response to these comments, the Secretary explained that the HCFA would utilize the MEDPAR index to make its determination and would exclude evidence from third parties. The Secretary justified this on the basis of administrative convenience and accuracy. The Agency had already accumulated information for MEDPAR which it knew to be accurate; rather than have all providers submit independent evaluations, the Agency elected to rely upon its own database. Far from originating outside the notice and comment channels, this issue of interpretation flowed directly from the rulemaking procedures. Rather than create or destroy substantive rights, the policy simply clarifies what the Secretary believes the regulation means and explains how the Agency will apply it. This Court concludes that the policy is an interpretive rule rather than a substantive one. Therefore, the Secretary did not need to follow the APA in its adoption.

■ Third, Good Samaritan has noted that the HCFA previously allowed providers to submit CMIs calculated by CPHA. While Medicare operated under the cost-based reimbursement system, a provider could submit a study based upon one hundred percent of its Medicare discharges. The HCFA allowed such studies, in part, because it recognized that errors existed within the MEDPAR database. According to the Hospital, the fact that HCFA previously accepted such studies demonstrates that its present refusal to do so is arbitrary and capricious.

---

2. In support of this argument, Good Samaritan has relied heavily upon *Loma Linda Community Hosp. v. Shalala*, 907 F.Supp. 1399 (C.D.Cal. 1995). Because this decision does not originate in this Circuit, it bears only persuasive authority, and this Court does not find its reasoning applicable to the present situation.

The example cited by Good Samaritan simply does not support this conclusion. Under the Hospital's reasoning an agency could never adopt a more restrictive interpretation of a statute or regulation without the new interpretation being arbitrary and capricious—even if the agency followed the full panoply of procedures available under the APA. Even discounting this rather extreme result, the facts of this case indicate that Congress directed the Secretary to follow a different approach for reimbursing Medicare providers when it switched from cost-based reimbursement to PPS. When the Secretary's overall approach changed, many of the specific procedures changed as well. As but one example, the Secretary needed to identify particular criteria for determining whether a provider qualified as an RRC. As one method of meeting the requirements, the provider needed to show it had a CMI of at least 1.03. Moreover, for the sake of administrative convenience as well as accuracy, the Secretary determined that the HCFA would base its determination upon CMIs previously published in the Federal Register. Nothing suggests that the decision to disallow the previous approach in favor of a new one was arbitrary and capricious.

Finally, Good Samaritan has attempted to demonstrate that—despite assertions to the contrary—the HCFA has on another occasion recalculated the CMI of a Medicare provider based upon one hundred percent of the provider's Medicare discharges. In support of this argument, the Hospital has sought to introduce evidence of a 1987 settlement agreement between the Agency and another Medicare provider. Plainly, the introduction of this evidence presents issues under Federal Evidence Rule 408, which prohibits the admission of evidence of settlement or other such agreements under certain conditions. Good Samaritan claims the evidence should be admitted for purposes of impeaching the Secretary's statement that no Medicare provider has been allowed to rely upon a CPHA study to show its CMI.

Setting aside the evidentiary issue, this Court does not believe that the evidence supports the conclusion the Hospital would draw from it: that the policy is arbitrary and capricious because the Secretary allows exceptions. The fact that an individual or entity has made one exception from a general policy does not demonstrate that the policy is arbitrary and capricious. Indeed, the decision to deviate from the policy may have itself been the arbitrary and capricious action. Logically, the fact that the Secretary may make exceptions suggests the general policy is not arbitrary and capricious, for the Secretary may consider the unique circumstances of a particular case and avoid a result which would be unjust. If, in this case, the Secretary had agreed to settle with Good Samaritan and consider the CPHA study, it would not have been arbitrary and capricious, but it is no more arbitrary and capricious for the Secretary to decline to make such an exception. For this Court to hold otherwise would allow the exception to define the rule.

## CONCLUSION

For the reasons set forth above, this Court now concludes that the Secretary's decision did not violate the standard of review stated in the APA. Her action was neither arbitrary and capricious, an abuse of discretion, nor contrary to law. Accordingly, this Court now **GRANTS** the Secretary's motion for summary judgment and **DENIES** Good Samaritan's motion for summary judgment.